**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| v. ) | **Criminal No: 1:21-cr-00086-001** |
| ) | **The Honorable Paul L. Friedman** |
| **ROBERT SANFORD,** ) | |
| Defendant. ) | |

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING**

The defendant, Robert Sanford, by and through undersigned counsel, pursuant to 18 U.S.C. §3553(a) and §6A1.3 of the United States Sentencing Guidelines (hereinafter U.S.S.G.), submits the following Position with Respect to Sentencing. In accordance with U.S.S.G. §6A1.2, Counsel certifies that he reviewed the Presentence Investigation Report (hereinafter PSR) with Mr. Sanford. Further, Mr. Sanford objects to any determination that he qualifies for a three-level enhancement because a victim sustained bodily injury pursuant to U.S.S.G. §2A2.2(b)(3)(A). As a result, the appropriate Total Offense Level is 23 with a corresponding guideline range of 46 to 57 months under Criminal History Category I. However, this guideline range does not adequately address certain specific characteristics of Mr. Sanford and is not an appropriate measure of his culpability in the present case. Based on the considerations set forth in 18 U.S.C. §3553(a), Mr. Sanford requests that this Court impose a sentence below the low end of this guideline range. A sentence of twelve months and one day followed by twelve months of home confinement and a three-year term of supervised release is sufficient, but not greater than necessary, to address these considerations.

**I.  Disputed Factors**

Pursuant to §6A1.3 of the Sentencing Guidelines the Court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P. When

any factor is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the Court regarding that factor. The government bears the burden of proving the applicability of a sentencing enhancement. *See, e.g., United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014).

Courts do not interpret the Guidelines in a manner different from their interpretation of statutory text. *E.g.*, *United States v. Martinez*, 870 F.3d 870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation."). In "statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364, 204 L. Ed. 2d 742, 750-751 (2019). "Where… that examination yields a clear answer, judges must stop." *Id.* (citing *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432, 438, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999)). Even where courts consider materials outside the text—such as life experience—they "will never allow it to be used to muddy the meaning of clear statutory language." *Id.* (internal quotation marks omitted). Thus, the proper inquiry into meaning "will most often begin and end with the text and structure of the Guidelines." *Id.* "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011).

### **Victim Sustained Bodily Injury §2A2.2(b)(3)(A)**

The Probation Officer tentatively noted in paragraph 34 of the PSR that because a victim sustained bodily injury the offense level is increased by three levels pursuant to USSG §2A2.2(b)(3)(A). However, in a footnote the Probation Officer noted that the probation office awaits additional detail regarding the extent of the injuries sustained by the victim law

enforcement officer(s) and, once received, this enhancement may be revised. Based on the information submitted by the government, this enhancement is not appropriate.

Under 18 U.S.C. 111, there are three tiers of conduct and punishment for assaulting certain officers. Section 111(a)(1) prohibits forcible assaults on officers engaged in or on account of the performance of official duties. Under this section, simple assault is punished as a misdemeanor with not more than one year imprisonment and where there is physical contact, punished as felony with not more than eight years imprisonment. Finally, if a deadly or dangerous weapon is used or bodily injury is inflicted then it is punished as a felony with not more than twenty years imprisonment.

The Guidelines define "bodily injury" as any significant injury. For example, an injury that is painful and obvious, or of the type for which medical attention ordinarily would be sought. USSG §1B1.1 Application Note 1(B). The bodily injury guideline enhancement does not apply to any injury sustained by a victim. This proposition is supported by the cases that the government relied on in support of this enhancement. The injuries described in each of those cases were significant.

In the present case, the empty fire extinguisher struck Sergeant P.R., who was not wearing a helmet. The blow caused P.R. to experience pain and develop a lump on his head. However, it is important to note that he did not seek medical attention. After turning to see where the blow came from, Sergeant P.R. returned his attention to the crowd in front of him and remained on the scene. The fire extinguisher also struck Officer W.Y. who was wearing a helmet. Officer W.Y. also remained on the scene and continued to focus his attention on the crowd in front of him. Officer W.Y. experienced a headache and later sought precautionary

medical care that did not reveal any physical injury. The physical contact with both officers does not rise to the level of "significant injury" and three level enhancement is not appropriate.

## II.     Considerations Under §3553(a)

It is well settled that the Sentencing Guidelines are advisory following the Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738, 757 (2005). While Federal Courts must still consider the defendant's sentencing exposure under the guidelines, the court is now free to "tailor the sentence in light of other statutory concerns". *Booker*, at 764-65; see also *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (the court shall consider the sentencing guidelines range as well as other relevant factors set forth in 18 U.S.C. §3553(a) before imposing sentence). As a result, this Court may consider permissible statutory factors such as: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes of the defendant, and to provide the defendant with reasonable rehabilitative opportunities; the kinds of sentences available; the guideline range; the need to avoid unwanted sentencing disparities; and the need for restitution. Upon consideration of these factors, a sentencing court may find that a case falls outside the "heartland" contemplated by the guidelines, that "the guidelines sentence itself fails properly to reflect the §3553(a) considerations", or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 345-46 (2007). Under recent decisions of the United States Supreme Court, *see e.g., Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007)*; other considerations exist that demand a lower sentence than that suggested by the Sentencing Guidelines. Therefore, if this Court considers Mr. Sanford's offense conduct

in the context of these factors, it is appropriate to impose a sentence of twelve months and one day followed by a term of 12 months of home confinement followed three years of supervised release.

### A. Nature and Circumstances of the Offense

On January 6, 2021, Mr. Sanford traveled with friends from Pennsylvania to the the Capitol. They boarded a bus organized by Turning Point USA with approximately fifty other people to attend former President Trump's rally. Mr. Sanford did not bring any weapons or other "tactical" implements such as zip ties, tactical gear, or body armor. Instead, Mr. Sanford brought a backpack that contained sandwiches, snacks, water, and first aid supplies. After 26 years of service as a firefighter, he always has first aid supplies on hand.

When he arrived at the Washington Monument and walked to the stage where the speeches were given there was already a huge crowd. He listened to the speakers then walked to the Capitol along with the crowd. At approximately 2:00 pm, the crowd breached the exterior barricades at the Capitol. When Mr. Sanford arrived at the Capitol there were already thousands of people on all sides of the building and Mr. Sanford does not recall seeing remnants of a perimeter fence but he did see people in the scaffolding. Unbeknownst to Mr. Sanford, rioters breached the western side of the Capitol at 2:11 pm. Around this time Mr. Sanford perceived that the law enforcement response to the rioters became more aggressive. Mr. Sanford was in the crowd that was exposed to chemical agents, possibly tear gas, and he remembers other projectiles hitting individuals in the crowd including him. At the time he believed that law enforcement was firing rubber bullets into the crowd. Mr. Sanford believed that he and the crowd had been attacked by law enforcement without cause.

This is the context for Mr. Sanford's state of mind when he picked up an empty fire extinguisher and flung it at a crowd of law enforcement, did the same with a traffic cone, and yelled at them. Certainly, this is not a justification for his action nor is it intended to be. Video clearly shows him throwing a fire extinguisher, that had the weight of being empty, into a crowd of police officers. Mr. Sanford has repeatedly expressed contrition to undersigned counsel for his actions on January 6th and is adamant that he has no interest in protest or politics in the future.

Shortly after throwing the fire extinguisher, law enforcement entered the Capitol through a side door and Mr. Sanford decided to return to the buses and leave the chaos at the Capitol. It is noteworthy that Mr. Sanford did not go to another location at the Capitol and re-engage with law enforcement. He did not enter or attempt to enter the capitol building. He is not a member of or otherwise associated with any extremist group involved with planning January 6th. He did not travel to the Capitol with an extremist group. He did not bring a weapon or wear tactical gear. He did not coordinate with other individuals once at the Capitol. He did not make threatening, violent, or menacing statements on social media before or after January 6, 2021. He did not participate in breaching any of the fences, barriers, doors, windows, or other access points of the Capitol.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

### B.   History and Characteristics of the Defendant

Mr. Sanford is fifty-seven years old and, prior to his incarceration, resided with his wife and children in Boothwyn, Pennsylvania. Mr. Sanford and his wife have been married for 19 years. She works as a school counselor and he retired from the City of Chester fire department in 2020 after 27 years of service. During his time as a firefighter, Mr. Sanford frequently risked his life to save others and experienced very dangerous situations while fighting fires.

Since his retirement, Mr. Sanford, who has always been an engaged and involved father, enjoyed having even more time to spend with his family. His daughter, 17, suffers from severe and debilitating migraines. Unfortunately they have not been able to identify an effective treatment. Prior to his incarceration, Mr. Sanford was on call to pick her up from school if she experienced a migraine. He would take her to the doctor for the various tests and treatments that she was undergoing. Unfortunately, after his incarceration, his daughter was not able to continue attending school due to the seriousness of her migraines and is now being home schooled. Mr. Sanford's son is an excellent baseball player. Prior to his incarceration, Mr. Sanford enjoyed transporting his son to games and practice. They also enjoyed bow hunting and fishing together. However, due to the restrictions of his home detention, Mr. Sanford missed many family events and baseball games that were outside his travel radius. Mr. Sanford is truly remorseful for the stress and anxiety that he has caused for his family and the events that he has missed.

After his arrest, Mr. Sanford sought mental health treatment and participated in individual and family therapy until his incarceration. This therapy helped Mr. Sanford and his family deal with the anxiety of the pending case, but it did not give him real insight into his conduct on

7

January 6. In August 2022, he began to work with an individual that specializes in cult deprograming. Even after he was incarcerated, he participated in regular discussions designed to challenge his ideology and belief structure, then help him understand how and why he developed the beliefs that led him to make the decisions that he did on January 6.

During this process, Mr. Sanford was confronted with facts about the "stolen election" conspiracy theory among others and how psychological manipulation is used to indoctrinate the followers of a conspiracy. Mr. Sanford learned how mental health problems, whether diagnosed or not, cause isolation which, when paired with belief in a conspiracy, gradually cause more isolation. He learned how the websites he was relying on for news would use algorithms to facilitate his trip down the proverbial conspiracy rabbit hole with more and more extreme articles. Consequently, it becomes easier to dismiss ideas and facts that do not fit with one's narrative. Mr. Sanford also gained the insight that one of the motivations he had for attending the January 6 rally was simply to be around people who agreed with him as opposed to his friends and family members who did not agree with bis beliefs.

Mr. Sanford regrets his actions and is deeply sorry for his conduct. He accepts full responsibility for his actions on January 6. There is no excuse or justification for his conduct. Since surrendering to law enforcement on January 14, 2021, Mr. Sanford worked diligently to make amends for his conduct and make real change in his life and ideology.

### C. Equity, Fairness, and Deterrence

A sentence of twelve months and one day followed by a term of 12 months of home confinement followed three years of supervised release is more than sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes. Mr. Sanford

has a Criminal History Category I.  He does not have any criminal convictions and the only charge on his record, possession of a controlled substance, occurred thirty years ago and was nolle prossed.  Mr. Sanford had never been in jail until he surrendered on January 14, 2021.  He remained in custody for six weeks until this Court released him on home detention with GPS monitoring on March 2, 2021.  For the following nineteen months, Mr. Sanford adhered to the terms of his release.  His primary function during that time was to provide transportation for his children for sports, school, and his daughters medical treatment. On September 23, 2022, Mr. Sanford entered his guilty plea and was taken into custody where he has remained for the last six and a half months. Mr. Sanford has been incarcerated or on home detention for 27 months since the time of his surrender.  This recommended sentence will send a clear message to Mr. Sanford that any future crimes will not be tolerated.  This sentence along with continued participation in mental health counseling and cult deprogramming will continue to rehabilitate Mr. Sanford while also minimizing the likelihood of recidivism.

A defendant's harsh pretrial confinement is a basis for a downward variance (and even a departure). *United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011) (a court "may reduce a sentence to account for the harsh conditions of pretrial confinement"); *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (same); *Bains v. United States*, 2009 U.S. Dist. LEXIS 2018, at *8 (D.N.J. Jan. 12, 2009) (poor conditions of pretrial condition "properly treated as grounds for a variance"). Since this Court remanded Mr. Thompson to the custody of the U.S. Marshalls on September 23, 2022, he was transferred to the Alexandria Adult Detention Center.  There he spent approximately two weeks in complete isolation pursuant to quarantine policies with occasional time out of his cell for personal hygiene.  For the next four months, he was housed in administrative sequestration and only allowed to leave his cell for two hours per day.  Recently,

Mr. Sanford was selected to work as a trustee in that unit which allows him to leave his cell more frequently to help with cleaning and meal distribution. This has proven to be a challenging time for Mr. Sanford and a constant reminder of the consequences of his actions and decisions and the impact those decisions are having on his family. Mr. Sanford continued to receive deprogramming counseling as well as services from jail mental health staff.

Mr. Sanford also appears to be a low risk to reoffend based on available objective empirical evidence. According to the United States Sentencing Commission, a male Criminal History Category I offender over the age of 50, like Mr. Sanford, has a historical general recidivism rate of 6.2%, which is *the lowest reported recidivist rate* in the Commission's study.[1] The general recidivist rates coupled with Mr. Sanford's history and personal characteristics leave little doubt that he will not reoffend and strongly militate in favor of a substantial variance from the advisory Guideline range.[2]

---

[1] *See* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 28 Ex. 9 (2004) (listing the recidivism rates for various types of offenders and considering demographics such as gender, age, race, drug use, marital status, etc.), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

[2] *See United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first offender status); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history and strong family ties); *See*, *e.g.*, *United States v. Huckins*, 529 F.3d 1312, 1318-19 (10th Cir. 2008) (a district court "may weigh a defendant's lack of a criminal record" in deciding whether to grant a downward variance from the advisory Guidelines range "even when the defendant has been placed into a criminal history category of I"); *United States v. Smith,* 2008 WL 1816564 *4 (4th Cir. 2008) (affirming downward variance based in part on the defendant's "exemplary life" and lack of a criminal history); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

Although general deterrence remains a required consideration under § 3553(a), there is little evidence to support a finding that harsh sentences deter future criminal conduct. The unique combination of motivation and circumstance that lead otherwise law-abiding citizens to risk prosecution and imprisonment are not so easily overcome by the simple imposition of lengthy sentences. While such a theory might be appealing on its face, the reality is that there is little to no difference in the deterrent effect between probation and imprisonment.[3] Indeed, available research suggests that the *certainty* of being caught and punished carries far greater deterrent effect than the *severity* of the punishment.[4] More importantly, no one with knowledge of this case and the consequences of Mr. Sanford's surrender, plea, and sentencing, would begin or continue a course of criminal conduct merely because this Court imposed a variant sentence. In fact, despite the sentences that January 6 defendants have received, the violent nature of the political discourse from the right was unchanged during the most recent election cycle.

The recommended sentence will serve as an appropriate deterrent for those who would consider engaging in similar conduct as Mr. Sanford. Regardless of the ultimate sentence, Mr. Sanford and his family have suffered significantly as a result of his conduct and the resulting conviction and incarceration. His conviction and punishment are meaningful reminders that even a life characterized by over 50 years of hard work and honest and lawful behavior can be

---

[3] See Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 PRISON J. 48S, 50S-51S (2011) (according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions"); see also Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

[4] S*ee also* David Weisburd *et al*., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent."), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf.

undermined by a lack of judgment towards the end of a long career as a public servant. *See e.g., United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing").

### D. The Guideline Range / The Need to Avoid Sentencing Disparities

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6). When the Guidelines fail to fairly distinguish one defendant from another, a district court can grant policy-based variances that are not subject to "closer review" because such variances are "not suspect." *See Kimbrough,* 552 U.S. at 109, *Spears v. United States,* 555 U.S. 261 at 264 (2009), *Rita v. United States,* 551 U.S. 338, 348 (2007).

To this end, the government adopted nine factors that it suggests the Courts consider to place each defendant on a spectrum as to their fair and just punishment. These factors are: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. The government also uses these same factors to assist with determining what plea offers to extend to which defendants. Taking these factors into consideration, Mr. Sanford's

offense conduct is the most analogous to his codefendant Mr. Lyon and they received similar plea offers.

Of these nine factors, Mr. Sanford satisfies three. He engaged in violent behavior by throwing an empty fire extinguisher at law enforcement officers. He cooperated and self-surrendered to law enforcement, and debriefed with law enforcement officers. He also exhibited evidence of remorse and contrition by pleading guilty and pursuing de-programming counseling for over 1.5 years. However, his guidelines range and the various enhancements fail to account for these factors and instead focus exclusively on the fact that he assaulted law enforcement.

For example, Robert Palmer, 1:21cr328-TSC, plead guilty to section 111(a) and (b) and the government requested 63 months. Palmer did not receive credit for acceptance of responsibility or a victim injury enhancement, otherwise his guidelines were the same as Mr. Sanford. In its position on sentencing the government described his conduct. Palmer first threw a wooden plank at the officers, then sprayed the contents of a fire extinguisher at the officers, and when it was empty, hurled it at the officers. Palmer then rooted around for additional materials with which to assault the police, including throwing the fire extinguisher a second time. A few minutes later, on the West Plaza, Palmer assaulted another group of law enforcement officers with a 4-5 foot pole by throwing it like a spear at the officers. Thereafter, in statements to a reporter, Palmer admitted that his goal was to subvert a democratic election and that he hoped for military intervention to overturn the election in order to keep the losing candidate in power. After his guilty plea, Palmer posted a public statement on the Internet falsely claiming that his actions on January 6 were purely defensive, and falsely claiming that his assaults on law enforcement were a reaction to – rather than the cause of – him being tear gassed and shot with a non-lethal projectile. The government recognized that unlike other Capitol defendants, Palmer

13

pled guilty relatively early, turned himself into law enforcement, and voluntarily met with the FBI to provide truthful information. Accordingly, the government recommended that the Court sentence Palmer to 63 months in custody, at the low end of the Sentencing Guideline range and that is the sentence that the Court imposed.

Unlike Sanford, Palmer engaged in repeated assaults on law enforcement on multiple occasions with at least three different objects, made statements that contradicted his plea, and attempted to profit from his experience. Their conduct was vastly different and yet the government is seeking more time for Mr. Sanford.

The government also suggested that Devlyn Thompson, 1:21cr461-RCL, is an analogous case however, he was actively engaged with law enforcement in the LWT tunnel for approximately 13 minutes attempting to breach the entrance to the Capitol. He also struck an officer with an actual weapon causing injury.

Mr. Sanford's conduct is even less serious to that of Kevin Creek, 1:21cr645-DLF, who was only charged with section 111(a). According to the government's position on sentencing, Creek traveled to Washington from Georgia with three others. He brought a knife, mace, and radios in case the phones went down. At the Capitol he broke through the bike rack barrier fence being held by law enforcement. Upon breaking through the line, Creek ran to the front of the crowd and grabbed an officer, knocked him to the ground and struck him in the face shield of his helmet. Creek then charged another officer and gave him a hard shove to the shoulders then kicked him, causing the officer to fall to the ground. Upon his arrest he was not remorseful for his conduct. His arguments at the sentencing hearing also suggest that he did not accept responsibility.

## III. Conclusion

For the foregoing reasons, Mr. Sanford respectfully requests that this Court impose a sentence of twelve months and one day followed by twelve months of home confinement and 3 years of supervised release. Mr. Sanford further requests that this Court recommended that he serve his sentence in a facility close to his residence.

Filed: April 4, 2023.

                                             Respectfully submitted,

                                             By: */s/ Andrew M. Stewart*  .
                                             ANDREW M. STEWART, ESQ.
                                             D.C. Bar No. 490984
                                             Attorney for the Defendant
                                             2111 Wilson Boulevard, 8th Floor
                                             Arlington, VA 22201
                                             Phone: 703-248-0626
                                             Fax: 703-248-8971
                                             andrew.m.stewart.esq@gmail.com

CERTIFICATE OF SERVICE

      I hereby certify that on the 4th day of April, 2023, I electronically filed the foregoing motion with the clerk of the court using the CM/ECF system, which will send an electronic copy to the following:

Janani Iyengar
Assistant United States Attorney
U.S. Attorney's Office, Eastern District of Virginia
555 4th Street, NW
Washington, D.C. 20001

      By: */s/ Andrew M. Stewart* .
ANDREW M. STEWART, ESQ.
Virginia State Bar No. 68683
Attorney for the Defendant
2111 Wilson Boulevard, 8th Floor
Arlington, VA 22201
Phone: 703-248-0626
Fax: 703-248-8971
andrew.m.stewart.esq@gmail.com